2022 IL App (1st) 191241-U

No. 1-19-1241

Order filed June 30, 2022.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | 16 CR 8096 |
| | ) | |
| WILLIAM WALLACE, | ) | The Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held*: The evidence was sufficient to sustain defendant's convictions for aggravated criminal sexual assault and attempted aggravated criminal sexual assault. In addition, the latter conviction did not violate the one-act, one crime doctrine, and any error in the jury instructions did not rise to plain error. Per the parties' agreement, defendant's aggravated battery conviction is vacated.

¶ 2   Following a jury trial, defendant William Wallace was found guilty of the aggravated

criminal sexual assault, attempted aggravated criminal sexual assault, aggravated criminal sexual

abuse and aggravated battery of 30-year-old N.W. On appeal, defendant asserts that (1) the State failed to prove that he sexually penetrated N.W.'s sex organ, as required to sustain his conviction for aggravated criminal sexual assault; (2) his conviction for attempted aggravated criminal sexual assault violates the one-act, one-crime doctrine; (3) the evidence was insufficient to sustain that conviction; (4) the trial court erroneously instructed the jury that it could consider an uncharged offense as evidence of his propensity to commit the charged offenses; and (5) his aggravated battery conviction must be vacated. For the following reasons, we vacate defendant's aggravated battery conviction and affirm the court's judgment in all other respects.

¶ 3                                    I. Background

¶ 4      Before trial, the State filed a motion to allow other crimes evidence, namely, evidence that defendant assaulted 16-year-old M.S immediately before he assaulted N.W. The State argued that such evidence was part of a continuing narrative but was otherwise admissible as evidence of defendant's propensity to commit sex offenses (725 ILCS 5/115-7.3(a)(1) (West 2016)). The evidence also spoke to N.W.'s credibility, consent, motive, *modus operandi*, identity, intent and the absence of mistake. The court granted that motion.

¶ 5      At trial, M.S. testified that on April 29, 2016, she lived in a second-floor apartment at 216 North Kilbourn with her mother, brothers and grandparents. Just after 8 p.m., M.S. was outside with family members, heading up the stairs into their home, when she felt a hand grab her "booty, like a tight firm grip." She was grabbed "not all the way in the middle but like, you know, when you go grip like cup under."

¶ 6      M.S. said, "that man just touched me," and ran upstairs. Her mother M.J. initially responded, "Girl, stop playing," having apparently not yet seen defendant, but M.J. then turned around, elbowed defendant and asked what he was doing. Upstairs in their apartment, M.S.

called 911 and M.J. told M.S.'s grandfather what had happened. M.S. saw from the window that defendant, now on the ground across the street, was fighting with another woman who was screaming for help. M.J. and M.S.'s grandparents went to the woman's aid, kicking and fighting defendant, without any reaction on his part, until the police arrived. The recording of M.S.'s 911 call was played for the jury.

¶ 7      M.J. testified that on the night in question, her family was walking in a single file line to enter the house when M.S., who was in front of M.J., said, "Mom, that man touched me." Initially, M.J. did not see anyone and said, "Girl, quit playing," or "Girl, go in the house." When M.J. turned to her right, however, she saw defendant, who was just a few inches away. She pushed everyone inside and elbowed defendant in the face. He just stood there and looked at her. Once M.J. was upstairs, she told her father C.S. what was happening. She and her father then joined her mother V.S. in the enclosed porch downstairs. Defendant continued standing there, looking back and forth between them, his phone and the front door.

¶ 8      When a woman across the street closed her car door, defendant looked in her direction and sprinted toward her "like a cat on a rat." After grabbing her, he threw her on the ground. While lying somewhat sideways on the ground, defendant had his arm around her neck while his other hand pulled her shirt up and her pants down. He rubbed "on her bra, across her breasts, [and] her privates." In addition, he "was in her pants moving around shuffling, like, by her vagina." M.J. also testified that defendant's hand was "[o]n her vagina, like in that area," as his fingers moved around in her underwear. He also kissed her face and mouth and put his tongue in her mouth. During this, the woman yelled for help, held onto her underwear and fought. M.J. and her parents also fought defendant, kicking and punching him. When the police arrived, M.J. saw that defendant's phone displayed pornography and his penis was hanging out of his zipper. The

testimony of V.S. and C.S. substantially corroborated much of M.J.'s testimony regarding defendant's attack on N.W.

¶ 9       N.W. testified that at 8:30 p.m. on the day in question, she was at her sister's home located at 217 North Kilbourn. After getting a cigarette from her car, she started walking back to her sister's home. People outside were yelling and cursing but she kept walking. Then, defendant grabbed her from behind and got her to the ground. She testified, "he was trying to hump my face and he was trying to pull my clothes down." Defendant subsequently repositioned himself so that they were face to face and he pulled her shirt up, putting her bare breast in his mouth. At some point, he put his mouth on her mouth. As he tried to lower her pants, she tried to pull them back up, but he ultimately managed to pull her pants down to her midthigh area and pulled her underwear down so that her vagina was exposed. N.W. further testified that defendant put "his finger down there." Specifically, "[i]t was like he was trying to go inside. He was moving his finger around and trying to find my vagina. He had his fingers inside my lips trying to go inside." She reiterated that defendant "had his fingers inside the lips of [her] vagina." Although N.W. testified that his finger made contact with or pressed her vagina, she denied that his finger ever "fully [went] into the hole of the vaginal opening."

¶ 10      During the attack, N.W. was screaming for help and fighting defendant. In addition to attacking N.W., defendant was holding his phone, which displayed pornography. After about 10 to 15 minutes, an older couple started hitting defendant. Somehow, N.W. got him off of her and ran back inside, during which time the police arrived. N.W. spoke to the police on the scene and later at the police station. She denied telling a police officer "that there was no penetration," but then acknowledged saying that defendant "placed his hand on [her] vagina but never penetrated [her] vagina." N.W. testified that at that time, she would not have used the word "penetration,"

did not know the word's legal definition and would have understood it to mean "a person going inside," or "literally having sex." In her mind, penetration was "full out insertion" into her vagina, which did not happen.

¶ 11    Afterward, N.W. went to the hospital where a rape kit was completed. She sustained scrapes on her hands, red abrasion marks on her face, a long scratch on her chest and scrapes on her back. She told the hospital staff that "there was no penetration from [the] assailant's hand or penis," and that "he did not insert his penis or finger into [her] vagina." Similar to her discussion with the police, she would not have used the word penetration at the hospital.

¶ 12    Officer Eric James testified that when he and Officer Page arrived at the scene, people were pointing at defendant, who was laying on his side in the parkway between the sidewalk and the curb. Defendant, whose pants were unzipped and unbuttoned, was pulling down his pants and had his penis exposed. He also held a cell phone displaying a video of a female masturbating.

¶ 13    Detective Daniel Berg testified that he was present  when the assistant State's Attorney interviewed M.S., who said that once N.W. was on the ground, M.S. could not see anything further. When Detective Berg turned on defendant's cell phone after obtaining a warrant, defendant's web browser was queued up to a pornographic movie clip.

¶ 14    Nurse practitioner Andrea Palwak testified that during N.W.'s examination at the hospital, she reported that an unknown male grabbed her about the arms and shoulders, pushed her to the ground and began attacking her. Once on the ground, he kissed her on the mouth, put his mouth on her left breast, attempted to pull down her pants and "touched the outside of her private part with his hands." Palwak's examination revealed a four-centimeter linear abrasion to N.W.'s chest, [and] multiple abrasions to her back, knuckle and face. Palwak did not do an internal examination, however, because N.W. said nothing had penetrated her. Palwak did not

remember the terminology she used in talking to N.W., but she did ask N.W. whether "anything went inside her vagina as if to have sex." Palwak was attempting to ask whether anything entered the vaginal canal, which was "the opening when you open the labia and that is the canal leading up to the cervix, the internal canal." The parties subsequently stipulated that defendant could not be excluded as a possible contributor to the DNA profile recovered from N.W.'s oral swabs.

¶ 15    Defendant testified on his own behalf that on the evening in question, he solicited a girl for a "blow job" while waiting to buy marijuana. She took him to a vacant lot, where he paid her $20, but she broke his zipper and complained that he was not erect. Defendant responded, "That's your job to get it on hard," and pulled up a pornographic video on his phone. While the two were renegotiating their financial arrangement, she snatched the money from his hand and took off. Around the corner, defendant saw a group of girls, including M.S., and believed she was the girl who took his money. He did not make contact with her buttock but did grab her by the arm. M.S. said, "Mama, that guy bumped into me." Defendant apologized while trying to fix his phone. He denied that M.S.'s mother elbowed him.

¶ 16    M.S. then said, "that's who you looking for over there." Defendant now believed that N.W. was the girl who had taken his money. He asked N.W. where his money was. When she ran, he grabbed her and tried to catch her hand, which he believed held his money. Defendant testified, "wherever she put her hand, that's where I was." While defendant was fighting with N.W. on the ground, her shirt came up and her pants came down. Defendant testified that he was not trying to remove her clothes or touch her in a sexual way. Rather, he was trying to see what she was hiding.

¶ 17    Meanwhile, a woman told defendant to leave N.W. alone and called the police. He sat on a stool waiting for the police officers to arrive. When they did, the women said he had tried to

rape N.W. Although his pants were up when the police arrived, it may have seemed as though his penis was hanging out because his zipper was broken. Additionally, he essentially testified that his phone was displaying pornography due to technical difficulties.

¶ 18    Defendant, who had a 2012 conviction for resisting the police, testified that he initially did not know that the police were investigating him as a sexual assault suspect. At the police station, he gave the foregoing account. Defendant also testified, however, that he had not at first told the police about soliciting a prostitute because his girlfriend was a retired detective who would have ended their relationship if she found out. When the police asked if he had touched a girl inappropriately, he did not deny it. Moreover, defendant told the police that he previously bought crack in that area, but not that he had smoked crack that day.

¶ 19    Detective Berg testified in rebuttal that at the police station, defendant said he had twice purchased crack cocaine that day and had been riding in a car when it pulled over for him to smoke three rocks. The car then drove away, and the police arrived. In addition, defendant said he believed he was in custody for controlled substances. He could not explain how he ended up on the ground.

¶ 20    The jury found defendant guilty of aggravated criminal sexual assault, attempted aggravated criminal sexual assault, aggravated criminal sexual abuse and aggravated battery.[1] The court sentenced him to 13 years in prison for aggravated criminal sexual assault and 7 years in prison for attempted aggravated criminal sexual assault, to be served consecutively. The court

---

[1]During deliberations, the jury asked, "Is the finger pressure on a sex organ considered penetration? Is there a legal definition of what constitutes a female sex organ? Is the labia considered part of the female sex organ?" The court responded, "You have received all the evidence and the law in this case, please continue to deliberate." Next, the jury asked, "What happens in a 11 to 1 count on one of the charges?" The court sealed the verdicts that the jurors had come to an agreement on and had them continue deliberating on the remaining charge.

also imposed concurrent sentences of 5 years in prison for aggravated criminal sexual abuse, and 3 years in prison for aggravated battery.

¶ 21                                    II. Analysis

¶ 22                          A. Aggravated Criminal Sexual Assault

¶ 23    On appeal, defendant first asserts that the State failed to prove he sexually penetrated N.W.'s sex organ, as required to sustain his conviction for aggravated criminal sexual assault.

¶ 24    In reviewing the sufficiency of the evidence, courts must determine whether, after viewing the evidence in the light most favorable to the State, any rational jury could have found the crime's essential elements proven beyond a reasonable doubt. *People v. Cline*, 2022 IL 126383, ¶ 25. We must draw all reasonable inferences in favor of the State. *Id*. In addition, the trier of fact is responsible for resolving conflicting evidence and drawing reasonable inferences from the facts. *People v. McLaurin*, 2020 IL 124563, ¶ 22. Reviewing courts must not retry the defendant or substitute the jurors' judgment with their own. *People v. Jackson*, 2020 IL 124112, ¶ 64. Moreover, we will not reverse the judgment unless the evidence was so improbable, unreasonable or unsatisfactory as to create reasonable doubt regarding the defendant's guilt. *Cline*, 2022 IL 126383, ¶ 25.

¶ 25    Section 11-1.30(a) states that "[a] person commits aggravated criminal sexual assault if that person commits criminal sexual assault and any of the following aggravating circumstances exist during the commission of the offense *** the person commits the criminal sexual assault during the course of committing or attempting to commit any other felony." 720 ILCS 5/11-1.30(a)(4) (West 2016). In this case, that other felony is aggravated battery. Additionally: "[a] person commits criminal sexual assault if that person commits an act of sexual penetration and *** uses force or threat of force[.]" 720 ILCS 5/11-1.20(a)(1) (West 2016). " 'Sexual

penetration' means any contact, however slight, between the sex organ or anus of one person and an object or the sex organ, mouth, or anus of another person, *or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ* or anus of another person, including, but not limited to, cunnilingus, fellatio, or anal penetration."[2] (Emphasis added.) 720 ILCS 5/11-0.1 (West 2016).

¶ 26    Illinois' definition of sexual penetration includes two broad categories of conduct: (1) any contact between the sex organ or anus of one person by an object or the sex organ, mouth or anus of another person (contact clause); or (2) any intrusion of one person's body part into the sex organ or anus of another person (intrusion clause). *People v. Maggette*, 195 Ill. 2d 336, 347 (2001). In *Maggette*, the supreme court determined that a finger is not an object and cannot satisfy the contact clause. *Id.* at 349-50. In addition, while inserting a finger into a sex organ satisfies the intrusion clause, merely touching or rubbing a sex organ with a hand or finger does not. *Id.* at 352. Yet, the evidence here shows that defendant inserted his finger into N.W.'s labia, satisfying the intrusion clause. See *People v. Janusz*, 2020 IL App (2d) 190017, ¶ 71 (Ultimately, the jury is entitled to decide whether sexual penetration occurred).

¶ 27    The female sex organ includes not only the vagina, but the labia marjora and labia minora, which are the external, outer and inner folds of skin. *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 44. For that reason, Illinois law does not require vaginal penetration to establish penetration of the sex organ. *People v. W.T.*, 255 Ill. App. 3d 335, 347 (1994). Rather, sexual penetration may occur by intrusion into the labia. *Janusz*, 2020 IL App (2d) 190017, ¶ 71.

---

[2]See also 720 ILCS 5/11-1.50(a)(1) (West 2016) (stating that "[a] person commits criminal sexual abuse if that person *** commits an act of sexual conduct by the use of force or threat of force); 720 ILCS 5/11-0.1 (West 2016) (defining sexual conduct as "any knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus, or breast of the victim or the accused").

¶ 28    The evidence showed that at a minimum, defendant's finger intruded into N.W.'s labia, part of her sex organ. N.W. unequivocally testified that defendant had his fingers inside "the lips of [her] vagina." She did not merely testify that he rubbed or pressed on her labia. See also *Gonzalez*, 2019 IL App (1st) 152760, ¶¶ 43, 46 (finding penetration of the victims' "sex organs," not just touching or rubbing, where one victim testified that the defendant "pushed in" her vagina and she circled the labia majora as the place where the defendant rubbed and press down, and the other victim testified that he put his finger in her vagina and circled the labia minora as the area he "was pushing into"); *cf. Maggette*, 195 Ill. 2d at 352 (finding the insufficient evidence of intrusion where the victim testified that the defendant touched her "vaginal area"); *People v. Kelly*, 185 Ill. App. 3d 43, 51-52 (1989) (finding evidence that the defendant poked the victim and toucher her in her "naughty place" was insufficient to show penetration); *Garrett*, 281 Ill. App. 3d at 545 (finding evidence that the defendant placed his finger on the victim's anus was "inconclusive as to whether [he] actually intruded into her anus, even slightly"). Defendant simply ignores that labia can physically be intruded into. We further note that the State clearly argued in closing that "defendant shoved his hands in her pants and was rooting his hand around and that his hand passed under the lips of the vagina."

¶ 29    Defendant argues that N.W. denied "penetration" to the police and hospital personnel. Yet, a jury could infer from her testimony that she understood penetration to mean something more limited than the legal definition, as the State had asked the jury to find during closing arguments. Accordingly, the evidence was sufficient to sustain defendant's aggravated criminal sexual assault conviction.

¶ 30                              B. One-Act, One-Crime

¶ 31 Next, defendant asserts that his conviction for attempted aggravated criminal sexual assault cannot stand because the indictment contemplated that that offense was based on the digital penetration of N.W.'s sex organ, the same act forming the basis of his aggravated criminal sexual assault conviction. See also 720 ILCS 5/8-5 (West 2016) (stating that "[n]o person shall be convicted of both the inchoate and the principal offense"). We review one-act, one crime challenges *de novo*. *People v. Coats*, 2018 IL 121926, ¶ 12.

¶ 32 The one-act, one-crime doctrine prevents a defendant from being convicted of multiple offenses for the same physical act. *People v. Smith*, 2019 IL 123901, ¶ 13. An act is any outward or overt manifestation that can support a different offense. *People v. Almond*, 2015 IL 113817, ¶ 47. Although this doctrine is not of constitutional dimension, it is intended to prevent the prejudice that could result where more than one offense is carved from a single physical act. *Smith*, 2019 IL 123901, ¶ 14. When a defendant commits multiple related acts, multiple convictions are nonetheless permissible so long as the offenses are not lesser included offenses. *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 16.

¶ 33 Defendant acknowledges that he did not raise this claim in the trial court but argues it is well settled that we may review a one-act, one-crime violation under the second prong of the plain error test (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)). *Coats*, 2018 IL 121926, ¶ 10. We find that no error occurred, let alone plain error. See *Id.* ¶ 11.

¶ 34 First, we must determine whether defendant's conduct consisted of one physical act or separate acts. *Smith*, 2019 IL 123901, ¶ 15. The evidence at trial permitted a finding that defendant engaged in at least two separate acts: (1) he made a digital intrusion into N.W.'s sex organ, and (2) he removed his penis from his pants with the intention of putting it in N.W.'s sex organ. See *People v. Bishop*, 218 Ill. 2d 232, 247-49 (2006) (upholding three convictions based

on three penetrations); *People v. Segara*, 126 Ill. 2d 70, 77 (1988) (recognizing that where a defendant commits two acts of criminal sexual assault, each was "readily divisible and intensely personal"). We must now turn to the charging instrument to determine how many offenses can be carved from this conduct. See *Smith*, 2019 IL 123901, ¶ 21.

¶ 35    The aggravated criminal sexual assault count stated that defendant "knowingly committed an act of sexual penetration upon N.W., to wit: an intrusion in that William Wallace inserted his finger into N.W.'s sexual organ, by the use of force or threat of force, and the criminal sexual assault was perpetrated during [an aggravated battery]." Thus, this count was based on the physical act of inserting his finger into N.W.'s sex organ, exerting force and committing an aggravated battery.

¶ 36    In comparison, the attempted aggravated criminal sexual assault count alleged that defendant, "with the intent to commit the offense of aggravated criminal sexual assault, knowingly attempted an act of sexual penetration upon N.W., to wit: William Wallace grabbed N.W., forced her to the ground, got on top of her, pulled her pants and underwear down exposing her sex organ, and while his penis was exposed, William Wallace touched N.W.'s sex organ multiple times, by the use of force or threat of force, and William Wallace attempted the criminal sexual assault during the course of *** aggravated battery, which constituted a substantial step toward the commission of the offense."

¶ 37    Like the aggravated criminal sexual assault count, the attempt count alleged the use of force and the commission of aggravated battery. This attempt count did not, however, allege that defendant inserted his finger into N.W.'s vagina. Instead, it alleged that he lowered N.W.'s pants and underwear, exposed his penis, and repeatedly touched her sex organ. The record rebuts

12

defendant's assertion that both charges were "based on the same act of attempted penetration of N.W.'s sex organ with his finger."[3]

¶ 38    The record further shows that the State intended to treat defendant's conduct as separate acts. In closing, the State argued that "defendant can be guilty of both a completed aggravated criminal sexual assault and the attempt because they involve different parts of the defendant's body." The State also argued with respect to the attempt count, "he's got his penis out, was he trying to put his penis in her vagina?" In short, this is not a situation where the State treated closely related acts as one in the indictment and at trial, and then changed course on appeal. *Cf. People v. Crespo*, 203 Ill. 2d 335, 345 (2001) (finding it would be profoundly unfair "to apportion the crimes among the various stab wounds for the first time on appeal"); see *Bishop*, 218 Ill. 2d at 245-46.

¶ 39    Defendant nonetheless asserts that his attempt conviction must be vacated because it is not possible to determine whether the jury found defendant guilty based on (1) attempting to penetrate N.W.'s vagina with his penis, or (2) attempting to penetrate her labia with his finger, the act underlying defendant's aggravated criminal sexual assault conviction. We find defendant conflates multiple legal issues.

¶ 40    This court has observed that  "*Crespo* addressed the manner in which the State conducted its prosecution of the defendant and not the jury's consideration of the relevant evidence presented to convict the defendant of the offenses charged." *People v. Stull*, 2014 IL App (4th) 120704, ¶ 52; but see *People v. Strawbridge*, 404 Ill. App. 3d 460, 463 (2010) (vacating one conviction where it was not possible to determine whether the jury found one or multiple penetrations occurred and, in turn, whether multiple offenses were or were not carved from the

---

[3]We note that defendant states in the nature of the case section of his brief on appeal that "[n]o issue is raised challenging the charging instrument."

same physical act). Furthermore, defendant's passing observation that the jury instructions and verdict forms did not specify the distinct acts underpinning each count does not constitute a sufficiently developed argument warranting consideration. Ill. S. Ct. R. 341(h) (7) (Oct. 1, 2020) (stating that "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"); *People v. Aljohani*, 2022 IL 127037, ¶ 61 (recognizing that Rule 341 requires a defendant to adequately develop his argument).

¶ 41    The final step in applying the one-act, one-crime doctrine is to determine, using the abstract elements test, whether one offense is a lesser-included offense of the other. *People v. Coats*, 2018 IL 121926, ¶ 11. Defendant has not argued, however, that either of the offenses at issue constitutes a lesser included offense of the other. Accordingly, we find no error.

¶ 42                  C. Attempted Aggravated Criminal Sexual Assault

¶ 43    Defendant alternatively argues that we should find the evidence was insufficient to sustain his conviction for attempted aggravated criminal sexual assault. "A person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8-4(a) (West 2016). Defendant concedes that his attack on N.W. was "violative and shameful" but argues that the evidence was insufficient to show he intended to insert his penis into N.W.'s vagina. See 720 ILCS 5/11-1.30(a)(4) (West 2016); 720 ILCS 5/11-1.20(a)(1) (West 2016); 720 ILCS 5/11-0.1 (West 2016). We disagree.

¶ 44    Evidence showed that defendant's acts that day were sexually motivated, notwithstanding his testimony to the contrary, and that he took his penis out of his pants. In addition, N.W. testified that defendant initially tried to hump her face and then lowered her pants. A jury could reasonably infer that having tried and failed to penetrate N.W.'s mouth with his penis,

defendant's ultimate goal became to penetrate her vagina with his penis. *Cf. People v. Crane*, 2020 IL App (3d) 170386, ¶ 29 (observing that unreasonable or speculative inferences are not permitted).

¶ 45    Defendant argues that the prosecutor acknowledged during closing argument that evidence of intent to penetrate N.W.'s vagina with his penis was insufficient because the prosecutor phrased his argument as a question: "he's got his penis out, was he trying to put his penis in her vagina?"

¶ 46    In the context of the prosecutor's entire closing argument, this was clearly not a concession. Additionally, challenges to the sufficiency of the evidence call upon us to examine the evidence, not the attorneys' arguments.  Accordingly, defendant has not shown that the evidence was insufficient to sustain his attempt conviction.

¶ 47                            D. Other Crimes Jury Instruction

¶ 48    Defendant further asserts that the trial court erroneously instructed the jury that it could consider defendant's act of touching M.S. as evidence of his propensity to commit the charged sex offenses. He acknowledges that he failed to preserve this issue but urges us to review this impropriety as plain error. See *People v. Mohr*, 228 Ill. 2d 53, 64-65 (2008) (stating that a defendant generally forfeits review of any error in the jury instructions unless he objected to the instruction or offered an alternative, and challenged the instruction given in a posttrial motion). Plain error may be found where either (1) the evidence is closely balanced; or (2) the error is serious. *People v. Hartfield*, 2022 IL 126729, ¶ 50.

¶ 49    Jury instructions convey the rules that apply to the trial evidence and guide the jury's deliberations toward an appropriate verdict. *People v. Parker*, 223 Ill. 2d 494, 500 (2006). In addition, fundamental fairness requires that the jury receive certain basic instructions essential to

its fair determination of the case. *People v. Fierer*, 124 Ill. 2d 176, 186 (1988). These basic instructions include, for example, the elements of the offenses at issue and the failure to tender such instructions is an "error so grave and fundamental that the waiver rule should not apply." *People v. Ogunsola*, 87 Ill. 2d 216, 222 (1981). Still, a jury instruction error rises to plain error only where it creates a serious risk that the jury convicted the defendant erroneously because they did not understand the applicable law, severely threatening the fairness of the defendant's trial. *Hartfield*, 2022 IL 126729, ¶ 50; see also *Sargent*, 239 Ill. 2d at 191 (stating that even an incorrect instruction on an element of an offense does not necessarily establish reversible error).

¶ 50    Evidence regarding a defendant's propensity to commit crimes has traditionally been excluded at trial because it tends to overly persuade the jurors, who may convict the defendant solely because they believe he is a bad person deserving to be punished. *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991). Under the common law, other-crimes evidence is not permitted to establish the defendant's propensity to commit crimes. *People v. Perez*, 2012 IL App (2d) 100865, ¶ 45. Such evidence is admissible, however, to show motive, identity and accident or absence of mistake. *People v. Dabbs*, 239 Ill. 2d 277, 283 (2010)

¶ 51    Moreover, the legislature enacted section 115-7.3 to allow courts to admit other crimes evidence to demonstrate that a defendant has a propensity to commit sex offenses if that statute's requirements are met. *People v. Donoho*, 204 Ill. 2d 159, 176 (2003). Pertinent to this appeal, where a defendant is charged with aggravated criminal sexual assault or aggravated criminal sexual abuse, evidence may be admitted that the defendant, on another occasion, committed aggravated battery "when the commission of the offense involves sexual penetration or sexual conduct as defined in Section 11-0.1." 725 ILCS 5/115-7.3(a)(1), (2), (b) (West 2016). Even where the defendant is charged with, and has previously committed qualifying offenses, the trial

court must weigh the probative value of the prior offense against undue prejudice to the defendant, considering, among other things, the time between the offenses and their factual similarity. 725 ILCS 5/115-7.3(b) (West 2016).

¶ 52     Here, defendant concedes that the act of touching M.S.'s buttock would constitute aggravated battery. He disputes, however, that this act involved sexual penetration or sexual conduct, as required to constitute a qualifying offense. While "sexual conduct" can include touching a victim's "anus" directly or through clothing (720 ILCS 5/11-0.1 (West 2016)), M.S. testified only that defendant touched her buttock. Thus, defendant argues that the court erred in instructing the jury that it could consider defendant's actions with respect to M.S. as propensity evidence. See *People v. Nibbio*, 180 Ill. App. 3d 513, 517 (1989) (finding that buttocks are not part of the sex organs or anus and, consequently, fondling the buttocks was not "sexual conduct") see also *Hartfield*, 2022 IL 126729, ¶ 45 (stating that the decision to give an instruction is reviewed for an abuse of discretion while we review *de novo* whether the jury instructions accurately conveyed the law); *Dabbs*, 239 Ill. 2d at 284 (reviewing the admissibility of other-crimes evidence for an abuse of discretion). Assuming error occurred, we do not find that it rises to the level of plain error.

¶ 53     Defendant asserts that the evidence was closely balanced as to whether defendant committed a sexual penetration during his attack on N.W. We disagree. N.W. unequivocally testified that defendant's fingers went inside her labia. Nothing contradicted that testimony, aside from possibly defendant's self-serving testimony that while her underwear came down, he was not trying to touch her in a sexual manner. Defendant has not established first-prong plain error.

¶ 54     Under the second prong, the defendant must show that clear error occurred that was so serious as to affect the fairness of his trial and challenge the judicial process' integrity. *Hartfield*,

2022 IL 126729, ¶ 50. Prejudice is then presumed due to the importance of the right involved. *People v. Sargent*, 239 Ill. 2d 166, 191 (2010). A fair trial is not the same as a perfect trial, however. *People v. Allen*, 222 Ill. 2d 340, 353 (2006). While a defendant is not required to show beyond a reasonable doubt that his trial was unfair because an erroneous jury instruction misled the jury to convict him, a defendant is required to demonstrate that an error caused a severe threat to the fairness of his trial. *People v. Durr*, 215 Ill. 2d 283, 299 (2005).

¶ 55    The jury was instructed that it was to decide whether defendant had been involved in another offense and "what weight should be given to this evidence on the issues of intent, motive, absence of mistake or accident, lack of consent, and propensity to commit aggravated criminal sexual assault, attempt aggravated criminal sexual assault and aggravated criminal sexual abuse." Thus, the jury was told it could consider the events involving M.S. on five different issues, only one of which was propensity to commit sex offenses. In addition, defendant does not dispute that the evidence of his interaction with M.S. was admissible for those four other purposes. Indeed, defendant concedes that evidence that he touched M.S.'s buttock immediately prior to the incident with N.W. was relevant to "the continuing narrative of the charged offenses, and it bore directly on the eyewitnesses' perceptions of the events in question." He also concedes that such evidence was admissible with respect to intent.

¶ 56    Here, defendant's conduct toward M.S. was extremely relevant to what occurred with N.W. immediately thereafter at the same location. Stated differently, the other crimes evidence here spoke volumes with respect to the continuing narrative as well as defendant's specific intent, motive, absence of mistake, and N.W.'s lack of consent. This eclipsed any perceived relevance of the M.S. offense to defendant's general propensity to commit the charged sex offenses. Defendant has not demonstrated any likelihood that the instruction's erroneous

propensity language was the reason the jury convicted him. The error did not pervade the entire factfinding process. *Cf. People v. Johnson*, 2013 IL App (2d) 110535 (finding that trial counsel was ineffective for allowing the defendant's domestic battery charge to be joined with weapons charges, that the jury was incorrectly instructed on propensity evidence, that these intertwined errors "amplified the prejudice to [the] defendant" and that the jury may have convicted the defendant for uncharged conduct); see also *People v. Potts*, 2021 IL App (1st) 161219, ¶ 223 (observing that *Johnson* involved a litany of intertwined errors and finding the instruction error at hand "did not come close, in scope or in consequence, to the morass of mutually compounding errors that rendered the trial in [*Johnson*] hopelessly defective and thus, fundamentally unfair"). In short, this error was not of such magnitude that he was denied a fair trial.

¶ 57                                    E. Aggravated Battery

¶ 58    Finally, defendant asserts, and the State agrees, that his conviction for aggravated battery was an element of the other counts and must be vacated under the one-act, one-crime doctrine. Accordingly, we vacated defendant's aggravated battery conviction.

¶ 59                                    III. Conclusion

¶ 60    The evidence was sufficient to sustain defendant's convictions for aggravated criminal sexual assault and attempted aggravated criminal sexual assault. Additionally, the latter conviction did not violate the one-act, one-crime doctrine, and any error made in instructing the jury on evidence of events involving M.S. did not rise to plain error. Finally, we vacate defendant's aggravated battery conviction as violative of the one-act, one crime doctrine.

¶ 61    For the foregoing reason, we vacate defendant's aggravated battery conviction and affirm the judgment in all other respects.

¶ 62    Affirmed in part and vacated in part.